UNITED STATES DISTRICT COURT

Northern District of California

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

CHAD CARRION,

    Defendant.

_____/

No. CR 09-0918 MEJ

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## INTRODUCTION

On September 18, 2009, the United States filed a two-count Information charging Defendant Chad Carrion ("Defendant") with operating a motor vehicle under the influence of alcohol, in violation of Title 36, Code of Federal Regulations, Section 1004.23(a)(1) ("Section 1004.23(a)(1)"), and operating a motor vehicle with blood alcohol content over .08 percent, in violation of Title 36, Code of Federal Regulations, Section 1004.23(a)(2) ("Section 1004.23(a)(2)"). (Dkt. #1.) The Court held a bench trial in this case on March 1, 2 and 12, 2010. (Dkt. ##9-11.) The Government called three witnesses: (1) Officer Stephen Smith, who arrested Defendant and administered the breathalyzer tests; (2) Sergeant Robert Jansing, who was responsible for maintaining the Alco-Sensor 4 and Intoxilyzer 5000 used in this case; and (3) Dr. Nikolas Lemos, a forensic toxicologist. Defendant testified on his own behalf and also called Dr. Jeffrey Zehnder, a forensic toxicologist.

As to the first count, the issue for trial was whether Defendant was under the influence of alcohol to a degree that rendered him incapable of safe operation. As to the second charge, the issue for trial was whether Defendant had 0.08 percent or more, by weight, of alcohol in his blood or breath while driving the vehicle. Having heard the evidence at trial, and having evaluated the substance and credibility of the witnesses, the Court renders the following Findings of Fact and

Conclusions of Law, pursuant to Federal Rule of Criminal Procedure 23(c)

**FINDINGS OF FACT**

1. The intersection of Arguello Boulevard and Moraga Avenue is located within an area administered by the Presidio Trust in the Northern District of California. *See* Transcript of Court Trial Proceedings, *United States v. Chad Carrion*, March 1, 2010 ("Trans.") at 46:1-3.

2. On the night of August 7, 2009, Officer Stephen Smith ("Ofc. Smith") was on duty at the intersection of Arguello Boulevard and Moraga Avenue in full uniform and in a marked police vehicle. *Id.* at 44:4-11.

3. Ofc. Smith has worked for the United States Park Police for four and a half years. *Id.* at 41:25 and 42:1-3.

4. Ofc. Smith underwent five months of training at the Federal Law Enforcement Training Center, where he received additional training and earned a certificate in DUI investigations from the National Highway Traffic Safety Administration. Ofc. Smith has conducted seventeen DUI investigations, not all of which led to arrests. *Id.* at 42:8-13 and 43:1-6.

5. At approximately 11:40 p.m. on August 7, 2009, Ofc. Smith observed a Black 300 Nissan driving down Arguello Boulevard, approach the intersection at Moraga Avenue, and continue through the intersection. The Nissan continued through the intersection without making a complete stop. *Id.* at 45:16; 44:12-18; 45:8-18.

6. Ofc. Smith did not attempt a traffic stop at that time. *Id.* at 78:11-12.

7. Failure to come to a complete stop at an intersection marked with a stop sign is behavior consistent with that of an individual who is mentally impaired due to alcohol. *Id.* at 116:6-21; 134:15-18.

8. After the Nissan failed to make a complete stop, Ofc. Smith began to follow the vehicle down Arguello Boulevard, at which point he observed the vehicle speed up to another vehicle far ahead of it, approaching within two or three car lengths. *Id.* at 45:20-25.

9. Further up Arguello Boulevard, between Infantry Terrace and Thomas Avenue, Ofc. Smith observed the vehicle move its left side tires onto the double yellow center dividing lines. *Id.*

1     at 46:15-18.

2  10.  Portions of the double yellow lines in this area of Arguello Boulevard are faded or missing,
3     but the location of the continuous double line along Arguello is still evident. Def.'s Ex. H.
4  11.  The vehicle then turned right onto Washington Boulevard, traveled 100 or 200 feet down
5     Washington Boulevard, and swerved completely across the double yellow dividing lines into
6     the opposing lane of traffic for two or three seconds, then crossed back over the double
7     yellow lines and over the fog line into the bicycle lane for one or two seconds. *Id.* at 47:6-8;
8     47:19-20; 47:10-16.
9  12.  Swerving onto the wrong side of the road is behavior consistent with someone who is unable
10     to correctly perceive and comprehend the environment around him, and is behavior
11     consistent with that of an individual who is mentally impaired due to alcohol. *Id.* at 122:7-
12     13.
13  13.  Ofc. Smith continued to follow the car as it made a left turn onto Deems Road, accelerated,
14     and turned right onto Piper Loop, at which point Ofc. Smith activated his police lights and
15     siren. *Id.* at 48:2-5; 48:10.
16  14.  The driver did not initially stop; instead, he continued driving for another 300 feet after Ofc.
17     Smith activated his lights and siren, until the driver pulled into a parking space off of Piper
18     Loop. *Id.* at 48:12-15; Def.'s Ex. Q.
19  15.  Failing to pull over when an officer activates their patrol lights and siren and continuing to
20     drive for 300 feet is behavior consistent with that of an individual who is mentally impaired
21     due to alcohol. *Id.* at 134:19-24.
22  16.  After he stopped, Defendant stepped out of his vehicle; Ofc. Smith had to tell him to return
23     to his vehicle twice before Defendant complied. *Id.* at 48:18-24.
24  17.  During his testimony, Ofc. Smith identified Defendant as the driver of the vehicle. *Id.* at
25     49:7-18.
26  18.  Ofc. Smith then approached the vehicle and asked Defendant for his license, which he could
27     not immediately retrieve; Defendant checked several pockets before eventually producing his
28

UNITED STATES DISTRICT COURT
For the Northern District of California

3

license. *Id.* at 50:7-9.

19. The inability to produce or find one's driver's license is behavior consistent with that of an individual who is mentally impaired due to alcohol. *Id.* at 134:25-135:1-4.

20. During this initial conversation, Ofc. Smith observed that Defendant had an odor of alcohol on his breath, his speech was slow, and his eyes were red and watery. *Id.* at 51:3-4; Govt.'s Ex. 3.

21. Ofc. Smith testified that, when asked, Defendant stated that he had been drinking. Trans. at 50:12-15.

22. Ofc. Smith testified that Defendant told him he went to happy hour at a restaurant in North Beach after getting off work around 5:30 or 6:00 p.m., where he consumed two or three Amstel beers. *Id.* at 50:20-23; 50:14-15.

23. Defendant did not slur his speech while talking to Ofc. Smith. *Id.* at 89:6-8.

24. An individual can be impaired at a blood alcohol level that is less than .08 percent; and that mental impairment manifests itself before physical impairment. *Id.* at 119:4-19.

25. Ofc. Smith asked Defendant to step out of the vehicle for further questioning and proceeded to perform a series of Field Sobriety Tests ("FSTs"). *Id.* at 51:6-12.

26. Ofc. Smith is trained in administering and certified to conduct FSTs by the National Highway Traffic Safety Administration; he was trained and certified in March of 2006. *Id.* at 51:13-24.

27. Prior to conducting the exams, Ofc. Smith asked Defendant if anything would prevent him from performing the tests; Defendant replied that he has scoliosis. *Id.* at 52:7-14; 92:5-7.

28. Ofc. Smith was unfamiliar with scoliosis and did not know at the time it was a curvature of the spine. He did not ask Defendant for clarification. *Id.* at 92:1-16.

29. Defendant also told Ofc. Smith that one of his legs was shorter than the other by 17 millimeters. *Id.* at 92:17-19.

30. Physical impairments such as scoliosis and a shorter leg could compromise a person's physical ability to perform FSTs. They do not, however, affect one's mental ability to

4

|   |   |   |
|---|---|---|
| 1 |   | perform the tests. *Id.* at 179:12-180:14; 182:19-183:10. |
| 2 | 31. | Ofc. Smith conducted the FSTs in the parking lot at 412 Piper Loop on a flat, clear and dry area with good lighting provided by overhead lights from a near-by building. *Id.* at 51:25-52:6. |
| 5 | 32. | Ofc. Smith then gave Defendant instructions and conducted the Horizontal Gaze Nystagmus test, which tests for involuntary eye jerking. *Id.* at 52:15-18; 93:1-3. |
| 7 | 33. | During the Horizontal Gaze Nystagmus test, Ofc. Smith observed four out of six clues indicating intoxication: distinctive and sustained nystagmus at maximum deviation in both the left and right eye, and the onset of nystagmus before the 45-degree angle in both the left and right eye. *Id.* 54:5-14. |
| 11 | 34. | The presence of four out of six clues in the Horizontal Gaze Nystagmus test indicates that an individual is impaired; additionally, the onset of nystagmus before an angle of 45 degrees suggests a blood alcohol content of 0.10 percent or greater. *Id.* at 137:1-4; 136:1-9. |
| 14 | 35. | Ofc. Smith testified that he does not cut and paste from prior reports. *Id.* at 98:23-24. However, in the Statement of Probable Cause that Ofc. Smith prepared, he refers throughout to "CARRION," but in the section regarding nystagmus, he refers to "AVALOS." Dkt. #23. |
| 17 | 36. | When Defendant's counsel questioned whether the name Avalos means anything to him, Ofc. Smith testified that it sounded like a previous DUI he made, Trans. at 98:5-7, and that he cut and pasted that portion of the probable cause statement from another DUI. *Id.* at 101:3-12. |
| 20 | 37. | Ofc. Smith then gave Defendant instructions and conducted the Walk and Turn test, in which a subject is required to walk a straight line on an imaginary line. *Id.* at 54:15-18; 96:1-10. |
| 22 | 38. | During the Walk and Turn test, Ofc. Smith observed three clues indicating intoxication: Defendant could not keep his balance while listening to instructions; he stepped out of position (feet heel-to-toe) during instruction; and he started the test before he was instructed to do so. *Id.* at 56:6-19. |
| 26 | 39. | Starting the Walk and Turn test before instructed to do so is behavior consistent with an individual who is unable to divide attention due to mental impairment. *Id.* at 133:25; 134:1- |

|   |     |                                                                                              |
|---|-----|----------------------------------------------------------------------------------------------|
| 1 |     | 4; 183:7-10.                                                                                 |
| 2 | 40. | During the test, Defendant walked the first nine steps without stepping off the imaginary line; on the second nine steps he stepped off the line one time. *Id.* at 97:14-21. |
| 4 | 41. | Additionally, during the Walk and Turn test, Ofc. Smith observed Defendant raise his arms more than six inches to assist in keeping balance. *Id.* at 57:3-6. |
| 6 | 42. | An inability to maintain balance while listening to instructions, raising one's arms during the Walk and Turn to maintain balance, and stepping off the line during the Walk and Turn are observations consistent with impairment. *Id.* at 137:12-20. |
| 9 | 43. | Ofc. Smith then gave Defendant instructions and conducted the One Leg Stand test, in which a subject is required to raise either leg off the ground approximately six inches and count from 1,001 until told to stop. *Id.* at 57:13-58:9. |
| 12 | 44. | During the One Leg Stand test, Ofc. Smith observed three clues indicating intoxication: Defendant swayed while balancing and raised his arms more than six inches to help balance; he put his foot down between his count of "1,003" and "1,004;" and began counting "five, six, seven" after counting "1,004" (failed to follow instructions). *Id.* at 59:6-7; 58:25-59:5. |
| 16 | 45. | At no time during the test did Defendant hop, wobble, or fall over. *Id.* at 105:5-14. |
| 17 | 46. | Swaying while balancing, raising one's arms more than six inches for balance, putting one's foot down during the test, and the inability to count as instructed is behavior consistent with impairment. *Id.* at 137:21-138:1; 135:5-9. |
| 20 | 47. | After observing Defendant's driving, speaking with him, and conducting the series of FSTs, Ofc. Smith formed the opinion that Defendant was under the influence of alcohol and was unable to safely operate a vehicle. *Id.* at 59:12-16. |
| 23 | 48. | Defendant volunteered to take a Preliminary Alcohol Screening ("PAS") test, which Ofc. Smith is trained to administer. Ofc. Smith administered the test with an Alco-Sensor 4 at 12:11 a.m. on August 8, 2009. *Id.* at 59:17-60:18. |
| 26 | 49. | The Alco-Sensor 4 unit was working properly on August 8, 2010, and was calibrated with its results in the acceptable range of .01 percent on both July 13, 2009 and August 11, 2009. *Id.* |

|     |     |     |
| --- | --- | --- |
| 1   |     | at 61:9-13; 7:11-11:20; Govt.'s Ex. 4. |
| 2   | 50. | Ofc. Smith recorded two samples from Defendant: the first, at 12:11 a.m., recorded a breath alcohol concentration of 0.095; the second, at 12:13 a.m., also recorded a breath alcohol concentration of 0.095.  Trans. 62:18-63:4; 106:3-10. |
| 5   | 51. | Shortly after the PAS tests, Ofc. Smith arrested Defendant and brought him to the U.S. Park Police Station at 1217 Ralston Ave. in the Presidio.  *Id.* at 63:12-14. |
| 7   | 52. | Ofc. Smith is trained and certified in administering a breath test on an Intoxilyzer 5000. Govt.'s Ex. 5. |
| 9   | 53. | The Intoxilyzer 5000 had been calibrated by Sgt. Jansing, who is trained to calibrate this device, on both July 24, 2009, and August 11, 2009, and was found to be operating accurately with results within an acceptable range on both occasions.  Trans. 13:2-8; 14:10-15:22; Govt.'s Ex. 7. |
| 13  | 54. | Calibration checks must be conducted on the Alco-Sensor 4 and Intoxilyzer 5000 units every 10 days or 160 tests.  *Id.* at 17:4-13. |
| 15  | 55. | Ofc. Smith gave the Defendant instructions and administered the Intoxilyzer 5000 test to Defendant using the Intoxilyzer checklist .  *Id.* at 64:14-20; 65:1-4; 65:22-24; Govt.'s Ex. 6. |
| 17  | 56. | Ofc. Smith recorded two samples from the Defendant: the first, at 1:05 a.m. recorded a breath alcohol concentration of 0.094; the second, at 1:06 a.m. recorded a breath alcohol concentration of 0.095.  Govt.'s Ex. 8. |
| 20  | 57. | Based on his observations, training, and experience, Ofc. Smith formed the opinion that Defendant was impaired, under the influence of alcohol, and was unable to safely operate a vehicle.  Trans. 69:22-70:5. |
| 23  | 58. | Based on a driver who was observed driving at 11:40 p.m., who had a blood alcohol content of .094 percent at 12.36 a.m., and who had stopped drinking an hour before the driving was observed, Dr. Lemos testified that it was his opinion that the driver was unable to safely operate a vehicle and the driver had a BAC greater than 0.08 at the time he was driving.  *Id.* at 187:14-188:3. |

7

**CONCLUSIONS OF LAW**

**A.     36 C.F.R. § 1004.23(a)(1)**

Title 36 of the Code of Federal Regulations, Section 1004.23(a)(1) provides that "Operating or being in actual physical control of a motor vehicle is prohibited while [u]nder the influence of alcohol . . . to a degree that renders the operator incapable of safe operation."  36 C.F.R. § 1004.23(a)(1).  Based on the evidence above, the Court finds that the Government has proven that Defendant, while operating the vehicle, was under the influence of alcohol to a degree that rendered him incapable of safe operation.  Ofc. Smith testified credibly that Defendant admitted to him that he had two or three beers that evening.  The Court also finds credible his testimony that Defendant continued through the intersection at Moraga Avenue and Arguello Boulevard without making a complete stop, and drove the vehicle's tires onto or over the double yellow center dividing lines at various points along Arguello Boulevard.  While the Court notes Defendant's Exhibit H, which shows that portions of the double yellow lines in this area of Arguello Boulevard are faded or missing, it is clear that the location of the continuous double lines along Arguello are still apparent, and there is no evidence that the Officer would be unable to connect the lines from one portion to the next.  The Court further finds credible his testimony that Defendant did not stop when the Officer initially activated his flashing lights and siren.  Defendant could have pulled over, but continued to drive for another 300 feet until he pulled into a parking space off of Piper Loop.

Ofc. Smith's description of Defendant's physical appearance and behavior was also credible and indicative of intoxication.  Ofc. Smith described Defendant's eyes as red and watery, his speech as slow, and that Defendant had an odor of alcohol.  The Court further finds credible Ofc. Smith's testimony about the administration of the FST.  Ofc. Smith testified credibly that he is trained in administering and certified to conduct FSTs.  According to the Officer, Defendant failed each of the three tests.  During the Horizontal Gaze Nystagmus Test, Ofc. Smith observed four out of six clues indicating intoxication: distinctive and sustained nystagmus at maximum deviation in both the left and right eye, and the onset of nystagmus before the 45-degree angle in both the left and right eye.  The presence of four out of six clues indicates that an individual is impaired.

8

1   During the Walk and Turn Test, Ofc. Smith observed three clues indicating intoxication: Defendant could not keep his balance while listening to instructions; he stepped out of position during instruction; and he started the test before he was instructed to do so. Ofc. Smith also observed Defendant raise his arms more than six inches to assist in keeping balance. Failure to follow instructions, an inability to maintain balance, raising one's arms to maintain balance, and stepping off the line during the test are observations consistent with impairment.

During the Leg Stand Test, Ofc. Smith observed three clues indicating intoxication: Defendant swayed while balancing and raised his arms more than six inches to help balance; he put his foot down between his count of "1,003" and "1,004;" and began counting "five, six, seven" after counting "1,004." These are behaviors consistent with impairment. After the FSTs, Ofc. Smith concluded that Defendant was intoxicated.

While the Court does not credit certain aspects of Ofc. Smith's testimony - in particular his statement that he does not cut and paste from prior reports, contrasted with his subsequent testimony that he did, in fact, cut and paste at least one portion of Defendant's probable cause statement - the Court finds credible the remainder of his testimony. Further, although the Court notes that a prior DUI Defendant's name - Avalos - appears one time in the statement of probable cause, the remainder of Ofc. Smith's report, including handwritten notes, is consistent with his account of the incident. *See* Def.'s Unmarked Ex., Dkt. #23; Govt.'s Ex. 2. Further, Ofc. Smith's demeanor and answers during his testimony appeared forthright. Finally, the Court notes that Ofc. Smith's observations were corroborated by the two Alco-Sensor 4 breathalyzer tests taken at the scene within half an hour of the initial stop, and two Intoxilyzer 5000 breathalyzer tests at the station. The samples recorded a breath alcohol concentration of 0.095 at the scene and 0.094 and 0.095 at the station. As discussed below, these test were valid and admissible.

The Court also acknowledges that, prior to performing the FSTs, Defendant informed Ofc. Smith that he has scoliosis and that one of his legs was shorter than the other by 17 millimeters. Despite this, Ofc. Smith did not ask Defendant for clarification regarding either of these two admissions. However, Defendant was not asked to do anything that required significant balance,

9

attention or dexterity, and no evidence was presented to show that they affected Defendant's test results.  Further, while Dr. Lemos testified that scoliosis and a shorter leg could affect the physical aspects of the FSTs in general, he also testified that neither would affect one's mental ability to perform the tests.  Transcript at 179:23-180:9; 183:19-22.  Based on the evidence, the Court is satisfied that Defendant's mental FST impairments, such as starting the test too soon and incorrect counting, combined with his physical FST mistakes, are consistent with an individual that is impaired.  Thus, taken together with the results of his breathalyzer tests, the evidence establishes beyond a reasonable doubt that Defendant was driving while under the influence of alcohol to a degree that rendered operation of the vehicle unsafe.

**B.     36 C.F.R. § 1004.23(a)(2)**

Title 36 of the Code of Federal Regulations, Section 1004.23(a)(2) provides that "Operating or being in actual physical control of a motor vehicle is prohibited while . . . [t]he alcohol concentration in the operator's blood or breath is 0.10 grams or more of alcohol per 100 milliliters of blood . . . .  Provided however, that if a State law that applies to operating a motor vehicle while under the influence of alcohol establishes more restrictive limits of alcohol concentration in the operators blood or breath, those limits supersede the limits specified in this paragraph."  36 C.F.R. § 1004.23(a)(2).  In California, "it is unlawful for any person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle."  Cal. Vehicle Code § 23152(b).

Based on the evidence, the Court finds that Defendant's blood or breath alcohol level was at or over .08% while in actual physical control of his car.  Ofc. Smith administered a total of four breathalyzer tests - over a period of 55 minutes, and all four were in the .094-.095 breath alcohol concentration range.  The Court notes that Ofc. Smith is trained to administer the breathalyzer tests.  Govt.'s Ex. 5. Sgt. Jansing testified that the Alco-Sensor 4 had been calibrated with its results in the acceptable range of .01 percent on both July 13, 2009 and August 11, 2009.  Sgt. Jansing also testified that he had calibrated the Intoxilyzer 5000 on both July 24, 2009, and August 11, 2009, and found both to be operating accurately with results within an acceptable range on both occasions.  The Court finds his testimony credible and that it is corroborated by the log which shows the

10

calibration was checked per relevant standards.

The Court acknowledges that calibration checks must be conducted on the Alco-Sensor 4 and Intoxilyzer 5000 every 10 days or 160 tests, and that Sgt. Jansing's calibration tests were not completed within that time frame. However, both machines were found to be operating accurately both in July and three days after the subject incident, and Defendant has not pointed to any evidence of any problems or inconsistency with the test results. Accordingly, the Court finds no reason to doubt the reliability of the test results, and they are admissible. Finally, the observations made by Ofc. Smith about Defendant's intoxicated appearance and behavior corroborate the breathalyzer test results here. Thus, the evidence establishes beyond a reasonable doubt that Defendant's blood or breath alcohol level was at or over .08% while in actual physical control of his car.

## CONCLUSION

Based on the above findings, the Court concludes that the Government has met its burden of proving beyond a reasonable doubt that:

1. Defendant operated or was in actual physical control of a motor vehicle while under the influence of alcohol to a degree that rendered operation of the vehicle unsafe on land administered by the Presidio Trust in San Francisco, California, in violation of 36 C.F.R. § 1004.23(a)(1), and

2. Defendant was in actual physical control of a motor vehicle while his blood or breath alcohol level was at or above .08% on land administered by the Presidio Trust in San Francisco, California, in violation of 36 C.F.R. § 4.23(a)(2).

Accordingly, the Court finds Defendant **GUILTY** of both Counts One and Two. Sentencing in this matter shall be set for November 4, 2010 at 10:00 a.m. in Courtroom B, 15th Floor, 450 Golden Gate Avenue, San Francisco, California. Defendant is directed to report to the U.S. Probation Office within 14 days of this Order so that work of the Pre-Sentence Report may be commenced.

**IT IS SO ORDERED.**

Dated: July 26, 2010

Maria-Elena James
Chief United States Magistrate Judge

11